# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | | |
|---|---|---|---|
| PAUL LAVELL WELCOME, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| v. | ) | No.: | 3:08-cv-320 |
| | ) | | (VARLAN/SHIRLEY) |
| | ) | | |
| HOWARD CARLTON, Warden, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## MEMORANDUM

This is a petition for the writ of habeas corpus, pursuant to 28 U.S.C. § 2254, filed by

petitioner Paul Welcome ("Welcome").  The matter is before the Court on the motion to

dismiss filed by the Tennessee Attorney General on behalf of respondent.  For the following

reasons, the motion to dismiss will be **GRANTED**, the petition for the writ of habeas corpus

will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.

I.     Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

§ 2254.  Under Rule 8 of the Rules Governing Section 2254 Cases In The United States

District Courts, the court is to determine, after a review of the answer and the records of the

case, whether an evidentiary hearing is required.  If no hearing is required, the district judge

is to dispose of the case as justice dictates.  If the record shows conclusively that Welcome

is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.    Factual Background

Respondent has provided the Court with copies of the relevant documents as to Welcome's direct appeal and post-conviction proceedings. [Doc. 9, Notice of Filing Documents, Addenda 1-21]. Welcome was convicted by a jury in the Circuit Court of Knox County, Tennessee, of first degree murder. The conviction was affirmed on direct appeal. *State v. Welcome*, No. 03C01-9709-CR-00386, 1998 WL 832433 (Tenn. Crim. App. Dec. 3, 1998), *perm. app. denied, id.* (Tenn. May 10, 1999) [Addendum 8].

On direct appeal, Welcome challenged *inter alia* the sufficiency of the evidence against him. The Tennessee Court of Criminal Appeals summarized the evidence against Welcome as follows:

> The defendant's conviction relates to the killing of Gregory Pate. Mr. Pate was shot in his home in a Knox County public housing project on April 14, 1995. The key issue at trial was whether the defendant or his brother, Steven Lavon Welcome, was the shooter. Both the defendant and his brother were indicted for the premeditated first degree murder of Mr. Pate. A second count of the indictment alleged felony murder in the perpetration of a robbery.[1] The cases were separated for trial, and the defendant's case was called for trial first.[2]
>
> [1] The trial court granted the defendant's motion for judgment of acquittal on the latter count.
>
> [2] The outcome of the proceedings against Steven Welcome is not reflected in the record.

2

The state's first witness was Dr. Sandra K. Elkins, a forensic pathologist and the Knox County Medical Examiner. Doctor Elkins performed an autopsy of the victim and determined the cause of death to be a gunshot wound to the head. The wound entered the victim's head in the right temporal region and traveled to the back left of the skull. There was no exit wound. Doctor Elkins found no evidence of stippling or tattooing, which indicated to her that the shot likely had been fired from a distance greater than 18 to 24 inches. Doctor Elkins analyzed the victim's blood and discovered the presence of cocaine and two cocaine metabolites. The only injury to the victim other than the gunshot wound was a laceration behind the left ear.

Angela Johnson, Steve Welcome's former girlfriend, testified that the defendant and his brother came to her apartment on April 14, 1995. The three went to the Welcomes' mother's house, and the defendant and his mother got in an argument which culminated in the defendant's mother putting the defendant's clothing in the yard. The defendant was mad after this confrontation; however, he had also been mad earlier because someone owed him money. The Welcomes and Johnson set out on foot toward a Knox County public housing project. Johnson inquired where they were going, but neither of the Welcomes responded. They reached one of the units, and the defendant went in without knocking. Steve Welcome and Johnson followed. The victim, a man and a woman were inside. The man and the woman went out the back door to a porch. Johnson could see them through a screen door.

The defendant asked the victim for his money. The victim responded that he did not have any money for the defendant and would pay later. Johnson sat down in Steve Welcome's lap in a chair beside the kitchen table. An argument between the defendant and the victim commenced, and the defendant and the victim "wrestled." The defendant pulled a gun from his shorts and told the victim that the defendant would have to do something to him if he did not produce the money. The defendant hit the victim in the mouth with the gun, and Johnson ran out the door. Steve Welcome followed her to the door but did not come outside. When Johnson left, the defendant was standing in front of the kitchen table and the victim was sitting on the table. About three minutes after she went outside, Johnson heard a gunshot. Steve Welcome came outside, and the two ran away. Paul Welcome came outside with a black briefcase and fled on foot, as well.

After the murder, the Welcomes came to Johnson's home and discussed the crime. The defendant tried to get Johnson to make up a story about the victim having a weapon.

3

James Harris, who is also known as Orlandas Robinson and claims the latter is his real name,[3] gave what appears to have been animated and sometimes inconsistent testimony. Harris was the victim's roommate on April 14, 1995. The victim was a cocaine addict, and he owed the defendant money for cocaine. The defendant came to Harris's and the victim's home about once a week wanting his money. On April 14, the defendant came to collect this debt. He was accompanied by his brother and his brother's girlfriend. They had a small black case with them. The defendant asked the victim if he had the money, and the victim said he would have it at the end of the month. Harris walked out the back door and stood on the porch. Later, he admitted he might have been sitting, rather than standing. He could see what was taking place inside through the screen door. The Welcomes commenced beating the victim, and Steve Welcome's girlfriend went outside. Harris testified both that the victim received the beating on the table and in a corner.FN4 The victim hit one of the Welcomes, then the defendant gave the victim some cocaine. Later in his testimony, Harris said Steve Welcome gave the victim the cocaine. The victim "went ... to do" the cocaine, and the defendant, who was on the victim's right side, shot the victim in the head. Later, Harris claimed the victim smoked the cocaine, everything was quiet in about two or three minutes, and then the defendant shot the victim. At the time of the shooting, Steve Welcome was on the left side against the table. Harris said later in his testimony that the victim was standing in the door between the Welcomes,FN5 with Paul to his right and Steve to his left. He first denied and then admitted he was talking to a neighbor when he was outside on the porch. He also said he was watching his girlfriend walk across a parking lot. Throughout his testimony, Harris remained steadfast in his identification of the defendant as the shooter.

> [3]Mr. Harris's alias is reflected elsewhere in the record as "Orlando Robinson," "Orlandus Robinson" and "Orlander Robinson."

After the shot, Harris fled the porch and called 911. Later, he said he went back in the house to check on the victim first, then went to call 911. He was scared of the defendant, so he told the 911 operator that his name was James Harris, rather than Orlandas Robinson. Later, when Harris was questioned by the police, he said he did not know where Orlandas Robinson was. During questioning, Harris identified the shooter as "Paul" and picked Paul Welcome from a group of photographs.

Not surprisingly, the defense conducted a vigorous cross-examination of Harris. In addition to the inconsistencies highlighted above, Harris said the man who shot the victim was about 5'8", and he denied telling the detectives

that the shooter was around 5'2" to 5'4". He admitted that Steve Welcome is shorter than the defendant. He said the shooter did not have braided hair and denied telling the detective that he did. He admitted Steve Welcome's hair was braided. The witness was cross-examined about the tape of his call to 911, which was played for the jury. In the tape, the defendant says that a man has been shot and that he heard the shot, but he never says that he saw the shooting. Harris was evasive and equivocal about whether he mentioned the presence of cocaine at the scene of the crime to the detective.

Detective Tom Pressley of the Knoxville Police Department was assigned to investigate the victim's homicide. He interviewed James Harris, who knew the shooter as "Paul" and picked a photograph of Paul Welcome from about 800 others. Harris was very scared when he was interviewed. Harris told Detective Pressley that the Welcomes had the victim pushed back over a table, and the defendant shot him. Harris described the defendant as having braided hair and being "about 5', 5'4", 5'2", 5'3"." Detective Pressley did not recall whether the defendant had braided hair when he turned himself in the day after the crime. Harris eventually admitted that he and Orlandas Robinson were the same person.

Following the presentation of the state's evidence, the trial court granted the defendant's motion for judgment of acquittal on the felony murder count.

The defense began its case-in-chief with the testimony of Brian Hicks, who had recently been incarcerated with Steve Welcome. Hicks claimed that Steve Welcome said that he and his brother had gone to the victim's house to get some money that the victim owed Paul Welcome. The victim did not want to pay, so Steve Welcome stuck a gun in his face and shot him.

Barry Rice, a private investigator, took a video of the crime scene for the defense. The video was played for the jury, and Rice narrated what was depicted. The video shows the exterior and interior of the victim's home, including views from both sides of the screen door through which Harris claimed to have witnessed the murder. On the video, it is difficult to see into the house from outside the screen door.

During Rice's cross-examination, the assistant district attorney repeatedly asked questions about which door was the front door and which was the back door.FN6 Thereafter, the defense recalled Detective Pressley, who clarified the location of the front door and back door as depicted in a photographic exhibit and the videotape.

The jury found the defendant guilty of first degree murder, and the trial court imposed a life sentence.

*State v. Welcome*, 1998 WL 832433 at \*\*1-4 (footnotes four, five, and six omitted). The appellate court concluded the evidence was sufficient to support the convictions. *Id.* at \*5.

Welcome then filed a petition for writ of error coram nobis and a petition for post-conviction relief, both of which were considered together and denied after an evidentiary hearing, and the Tennessee Court of Criminal Appeals affirmed. *Welcome v. State*, No. E2006-02022-CCA-R3-PC, 2007 WL 4192017 (Tenn. Crim. App. Nov. 28, 2007), *perm. app. denied, id.* (Tenn. April 7, 2008 [Addendum 21].

In support of his petition for the writ of habeas corpus, Welcome alleges (1) actual innocence; (2) failure of the prosecution to disclose exculpatory evidence; (3) numerous instances of ineffective assistance of counsel; and (4) various constitutional violations. Respondent contends he is entitled to judgment as a matter of law based on procedural default with respect to many of Welcome's claims, and judgment as a matter of law based upon the findings of the Tennessee state courts as to the remaining claims.

III.    Procedural Default

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must

6

have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Welcome cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(c). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

7

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

The Court has reviewed the entire record of this case.  In his habeas corpus petition, Welcome alleges, without elaboration, that the prosecution failed to disclose evidence favorable to the defense.  Welcome did not, however, raise that issue on direct appeal of his conviction.  [Addendum 6, Brief of Appellant on direct appeal, p. 3, Issues for Review].  He has therefore procedurally defaulted that claim.[1]

Welcome also alleges his conviction violated the following constitutional rights: due process, limitation on right of eminent domain, right to speedy trial, right to witnesses, right to counsel, and right to assembly.  On direct appeal, however, Welcome only raised the issue of his right to due process.  Accordingly, Welcome defaulted his constitutional claims as to limitation on right of eminent domain, right to speedy trial, right to witnesses, right to counsel, and right to assembly.

The Court will consider on the merits only Welcome's claim of actual innocence, his constitutional claim that his right to due process was violated, and his claims of ineffective assistance of counsel.  With respect to those claims, respondent contends he is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.

_____

[1]On direct appeal, Welcome raised, in the context of a due process claim, his allegation that the prosecution failed to disclose Harris's inconsistent statements and criminal record in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Accordingly, the Court has considered this claim as a due process violation.  *See* Section V.B., *infra*.

IV.  State Court Findings

Pursuant to 28 U.S.C. § 2254(d), Welcome may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court.  In addition, findings of fact by a state court are presumed correct and Welcome must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).  Welcome has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this Court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1).  A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at 413.  A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

9

incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. In light of the foregoing, the Court will consider Welcome's remaining claims for relief.

V.     Discussion of Claims on the Merits

*A. Ineffective Assistance of Counsel*

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), Welcome must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting

10

aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable.  *Id.* at 691-92.

Welcome alleges three instances of ineffective assistance of counsel with respect to the testimony of James Harris, aka Orlandas Robinson: (1) failure to impeach Harris's testimony by use of criminal convictions for burglary and larceny; (2) failure to impeach Harris's identification of the shooter as Paul Welcome when he gave a physical identification of Steve Welcome as the shooter; and (3) failure to attack the honesty of Harris based upon Harris having provided a false social security number to the authorities.  Welcome also alleges his attorney failed to interview and properly prepare for the government's witnesses.

Welcome alleged ineffective assistance of counsel in support of this post-conviction petition.  In considering the denial of post-conviction relief, the Tennessee Court of Criminal Appeals first reviewed the evidence presented at the evidentiary hearing:

> An evidentiary hearing was held in two parts on December 13, 2005, and April 21, 2006. The testimony of the petitioner's trial counsel was taken by telephone deposition because trial counsel had closed his law practice and moved to Japan. Counsel testified that he hired an investigator and attempted to locate and interview each of the State's witnesses prior to trial. He was unable to locate James Harris, who was the primary witness for the State. Counsel recalled that he was "totally caught off guard" when Mr. Harris claimed at trial that his real name was Orlandoas Robinson, but he maintained that he had done his best to thoroughly cross-examine the witness. He stated that he chose not to "press" Mr. Harris on certain issues, particularly with regard to the description he provided of the perpetrator, because he was afraid of what Mr. Harris might say. Counsel confirmed that Mr. Harris had consistently maintained that the petitioner was the shooter, and that, despite the fact that the physical description he provided did not match the petitioner, Mr. Harris was familiar with the petitioner because he had seen him at the victim's house prior to the day of the shooting.

Counsel insisted that he felt he had done a good job of discrediting Harris and "made a judgment call" to "leave well enough alone" and not pursue every issue with the witness. Counsel recalled that he had pulled the criminal histories of several individuals named "James Harris" and had attempted to locate a criminal history for "Orlando Robinson." He did not use them to impeach the witness, however, because he had no way to verify that the witness was the same person listed in the criminal history. When confronted with a criminal history for a "James Earl Harris" from Texas, Counsel explained that he did not believe the trial court would have allowed him to utilize the criminal history during cross-examination because of doubts about the witness's identity.

Counsel recalled that the primary theory of the defense was that the petitioner's brother, Steve Welcome, had committed the murder. He called Steve Welcome's cellmate, who testified that Steve Welcome had admitted shooting the victim. According to Counsel, sometime after the conclusion of the trial, Steve Welcome approached him at the courthouse and admitted that he had shot the victim. Counsel stated that he relayed the information to the petitioner's post-conviction counsel.

Greg Harrison, who was the prosecuting attorney in the petitioner's case, testified that he was aware prior to trial that the petitioner had asserted that Steve Welcome was the shooter. He stated that prior to trial, Steve Welcome told police that the petitioner was the shooter. When asked whether he would have tried the petitioner for first degree murder if Steve Welcome had confessed to the killing prior to trial, Mr. Harrison responded, "I don't know. Stevie Welcome was not credible at all."

Mr. Harrison testified that he first learned from Counsel that James Harris was also known as Orlando Robinson and that he made the witness available to Counsel just before trial to explore the issue but Counsel declined. Mr. Harrison stated that he did not believe that Mr. Harris was an "impressive" witness because of his "mannerisms" but noted that Mr. Harris "never wavered at all" in his identification of the petitioner "as being the person who committed the crime." Similarly, Mr. Harrison recalled that although Mr. Harris "was not firm" in his description of the shooter, he was firm that the petitioner was the shooter. Mr. Harrison testified that he believed that Counsel was very effective at trial, particularly as it related to the cross-examination of Mr. Harris.

Kim Parton, who had been appointed to represent Steve Welcome for his role in the victim's murder, denied that Steve Welcome told her that he had shot the victim. She also indicated that she likely would not have believed Steve Welcome if he had confessed, noting that she "was hard pressed to believe anything that came out of his mouth." She noted that Steve Welcome had at various times manipulated the criminal justice system to his advantage. Ms. Parton acknowledged that Steve Welcome's "criminal history and his attitude and demeanor" led her to believe that "it was far more likely that he was the trigger person than his brother who did not have a criminal history." She also acknowledged that "the physical evidence pointed to the fact that [Steve Welcome] very well could have been the shooter." She recalled that Steve Welcome was "very happy" about the plea agreement she reached with the State. She also observed that Steve Welcome did not make his written confession to the crime until after jeopardy had attached and he had served his sentence under the terms of the plea agreement.

Steve Welcome testified that on the day of the shooting, the victim and the petitioner "had a discussion about some money. And they got to sort of like arguing and ... like tussling somewhat. [The victim] ... reached behind his back ... two or three times. And I told him twice ... not to reach.... And he reached again so ... I shot him after that." Steve Welcome recalled that he shot the victim in the right temple with a gun that belonged to him. He stated that after the shooting, he hid from police and instructed his girlfriend, Angie Johnson, who had been outside during the shooting, to "keep [him] out of it" and tell police she had seen the petitioner with a gun. He admitted telling the police that the petitioner had shot the victim, explaining that he did so because he was angry with the petitioner for turning himself in and for starting the fight with the victim. Steve Welcome insisted that he told Ms. Parton prior to trial that he was the shooter, and that she warned him not to say that again. He stated that he confessed the shooting to Counsel after the petitioner's trial because he "felt bad" that his brother was going to prison for life. He acknowledged that he was aware that jeopardy had attached and that the State could not prosecute him for shooting the victim.

The petitioner testified that Steve Welcome shot the victim while the petitioner and the victim were fighting over money the victim owed the petitioner. The petitioner, who recalled that the primary theory of defense was that Steve Welcome was the shooter, acknowledged that Counsel had vigorously cross-examined James Harris on the issue of his true identity, that Counsel had presented the testimony of a "jailhouse snitch" who testified that Steve Welcome had confessed to shooting the victim, and had presented a

13

videotape of the murder scene that was designed to show that the shooting could not have happened in the manner described by Mr. Harris. Although he maintained that Counsel should have interviewed Mr. Harris prior to trial regarding his use of the alias Orlando Robinson, the petitioner admitted that he knew Mr. Harris prior to trial and acknowledged that Mr. Harris was present outside the victim's apartment at the time of the shooting.

*Welcome v. State*, 2007 WL 4192017 at **3-5.

The appellate court then noted the standard of review for claims of ineffective assistance of counsel as set forth in *Strickland v. Washington*:

> When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Second, he must show that the deficiencies "actually had an adverse effect on the defense." The error must be so serious as to render an unreliable result. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. Should the petitioner fail to establish either factor, he is not entitled to relief.

*Id*. at *7 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *Strickland v. Washington*, 466 U.S. at 693, 687, 695) (internal citations omitted).

With respect to Welcome's claims of ineffective assistance of counsel as to James Harris, the Tennessee Court of Criminal Appeals concluded that Welcome failed to carry his burden of proof:

> The petitioner contends that Counsel should have interviewed James Harris prior to trial, should have "appropriately" cross-examined him, and should have more effectively impeached him. Counsel testified that although he attempted to locate James Harris prior to the day of trial, he was unable to do so. He also stated that he did not interview Mr. Harris on the day of trial even after learning that he was present in the courthouse. Counsel also conceded that he was "caught completely off guard" when the witness testified that he also went by the name Orlando Robinson. Nevertheless, Counsel believed that he had effectively cross-examined the witness regarding the

14

inconsistencies in his statements regarding the murder, the description of the perpetrator, and his alias and true identity. Counsel also introduced into evidence a videotape of the crime scene that called into question Mr. Harris's description of the events. When asked why he did not pursue other avenues of questioning, Counsel responded that he "made a judgment call" to "leave well enough alone" because he feared that any further questioning might be unfavorable to the petitioner. Counsel also testified that he did not use any criminal history to impeach the witness because it was his belief that the trial court would not have allowed him to do so given that doubts existed as to the witness's true identity.

Mr. Harrison testified that he believed that Counsel's cross-examination of Mr. Harris was particularly effective and recalled that he was glad when it was over. In addition, this court noted on direct appeal that the cross-examination of Mr. Harris was "vigorous." The record establishes that Counsel diligently cross-examined Mr. Harris regarding the fact that the description he provided of the perpetrator did not match the petitioner and the fact that he did not reveal his "real name" until the day of trial. In our view, the petitioner has failed to establish that Counsel's performance was deficient, and he is not entitled to relief on this issue.

*Id*. at *8.

In his habeas petition, Welcome alleges, without elaboration, that his attorney failed

to interview and properly prepare for the government's witnesses. To the extent Welcome

is referring to Angela Johnson, that claim was considered and rejected by the Tennessee

Court of Criminal Appeals:

Finally, the petitioner contends that Counsel was ineffective by failing to interview and "appropriately" cross-examine Angela Johnson. The petitioner asserts that Counsel should have made more of an effort to locate the witness prior to trial and should have cross-examined her with inconsistencies in her statement and that provided by Steve Welcome prior to trial.

Counsel testified that he attempted to locate Ms. Johnson prior to trial but was unable to do so. He admitted that he might have been able to locate the witness through her mother but did not think of that prior to trial. Counsel stated that he did his best to thoroughly cross-examine Ms. Johnson, whom he

believed to be a credible witness. Mr. Harrison agreed that Ms. Johnson was a credible, strong witness and that Counsel had done a very effective job in cross-examining her.

We cannot comprehend how Counsel was ineffective by failing to attempt to impeach Ms. Johnson with the pretrial statement of another witness. Although the petitioner points to inconsistencies between the testimony provided by Ms. Johnson and the pretrial statement of Steve Welcome, he has failed to note any inconsistencies in the accounts provided by Ms. Johnson herself. Moreover, if Counsel had attempted to use Steve Welcome's statement during trial, he would have been faced with the fact that, in that same statement, Steve Welcome asserts that the petitioner shot the victim. Finally, the point that the petitioner apparently wanted to be made, that Ms. Johnson made no mention of a black case carried by one of the two Welcome brothers, is of very little probative value and would not have, in our estimation, made any difference in the outcome of the trial. The petitioner is not entitled to relief on this issue.

*Id.* at 9.

This Court has reviewed the record of Welcome's post-conviction proceedings.

[Addendum 10, Technical Record of Post-Conviction Proceedings; Addendum 11, Transcript of the Evidence, Vol. I, pp. 1-86; Addendum 12, Transcript of the Evidence, Vol. II, pp. 1-50; Addenda 13-18, Exhibits 1, 2, 4, 6, 7, and 8, respectively, to the Post-Conviction Evidentiary Hearing[2]].  The summary of the evidentiary hearing by the Tennessee Court of Criminal Appeals, as well as that court's conclusions, are supported in the record.

As noted by the Tennessee Court of Criminal Appeals, plaintiff's trial counsel, William Lee Brown, testified at the post-conviction hearing by telephone deposition. [Deposition of William Lee Brown, Addendum 15, Exhibit 4 to the Post-Conviction

---

[2]Exhibit 3 was the transcript of the trial and exhibit 5 was the transcript of the hearing on the motion for new trial, both of which were already in the record.

16

Evidentiary Hearing]. Although Mr. Brown did not have the opportunity to speak with James Harris prior to trial [*id*. at 5] and was surprised at trial when Harris claimed to be Orlando (or Orlandis) Robinson [*id*. at 7], Mr. Brown believed he conducted an appropriated cross-examination of Harris as to the inconsistencies in his statements to police, the inconsistencies as to his own identity, and his descriptions of the shooter and the shooting, to the extent that Harris was not a believable witness. [*Id*. at 26-28]. As Mr. Brown acknowledged, however, Harris was unwavering in his assertion that he knew Paul Welcome, and that Paul Welcome, not Steve Welcome, was the shooter. [*Id*. at 31-33]. Mr. Brown also noted that Angela Johnson was a credible witness, whose testimony was harmful to the defense. [*Id*. at 28-29].

Greg Harrison, the prosecutor in the case, testified at the post-conviction hearing that James Harris was not an impressive witness and that Mr. Brown conducted a very effective cross-examination of Harris, but that Harris was consistent in identifying Paul Welcome as the shooter in the case. [Addendum 11, Vol. I, Transcript of the Evidence at the Post-Conviction Evidentiary Hearing, pp. 17-20]. Mr. Harrison further testified that Angela Johnson was a "very credible" witness who "never wavered" in her testimony. [*Id*. at 20-21]

As the Tennessee Court of Criminal Appeals noted on direct appeal, Mr. Brown "conducted a vigorous cross-examination of Harris." *State v. Welcome*, 1998 WL 832433 at *3. That determination is supported in the record. [Addendum 3, Transcript of the Evidence, Vol. II, pp. 119-160]. Angela Johnson's credibility as a witness is also supported in the record. [Addendum 2, Transcript of the Evidence, Vol. I, pp. 69-100].

Based upon the foregoing and the record as a whole, this Court concludes that the state courts' determinations that Welcome received the effective assistance of counsel were neither contrary to, nor did they involve an unreasonable application of, federal law as established by the Supreme Court in *Strickland v. Washington*.

## B. Violation of Due Process

Welcome alleges his conviction violated his constitutional right to due process. He raised this issue on direct appeal:

> In a related issue, the defendant alleges a due process violation because the state did not disclose inconsistencies in statements James Harris, a/k/a Orlandas Robinson, gave prior to trial. Further, the state did not disclose Harris's criminal record. The defendant contends that disclosure of both the inconsistencies and the criminal record was required under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*State v. Welcome*, 1998 WL 832433 at *10.

In considering this claim, the Tennessee Court of Criminal Appeals first noted that the Supreme Court in *Brady* "held that the prosecution has the duty to furnish exculpatory evidence to the accused upon request" and that failure to due so "'violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution.'" *Id*. (quoting *Brady*, 373 U.S. at 87). The appellate court also noted the Supreme Court's subsequent holding that "both exculpatory and impeachment evidence fall under the *Brady* rule." *Id*. (citing *United States v. Bagley*, 473 US. 667, 676 (1985).

The court next rejected Welcome's due process claim as to Harris's inconsistent statements, despite Welcome's failure to properly present the claim:

Notwithstanding the defendant's waiver of this issue, we note generally that while Harris's testimony may be fairly viewed as inconsistent on some points both internally (with other parts of his trial testimony) and externally (with his pre-trial statements), his eyewitness account of the defendant shooting the victim remained constant. More significantly, we see no real material differences between his transcribed pre-trial statement and the various unrecorded statements he gave Officer Pressley and General Harrison. The defense had the transcribed statement, and it effectively cross-examined Harris about the inconsistencies between this statement and his trial testimony, as well as the internal inconsistencies in the trial testimony. Thus, if this issue was properly before us, we would fail to find a *Brady* violation because there were no material inconsistent statements that could have been produced by the state.

*Id*. at *11.

The determination by the Tennessee Court of Criminal Appeals on this issue was neither contrary to nor did it involve an unreasonable application of federal law. *See Kyles v. Whitley*, 514 U.S. 419, 433-34 (1985) (quoting *Bagley*, 473 U.S. at 682) ("Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'").

With respect to the prosecution's alleged failure to produce Harris's criminal record, the appellate court against rejected Welcome's claimed due process violation:

Turning next to Harris's alleged criminal record, we find the record deficient in supporting the defendant's claim he did not receive this potential impeachment evidence. At the motion for new trial, Detective Pressley testified that an N.C.I.C. record check for James Harris was in the file the police department gave the prosecution. General Harrison testified that upon his entry in the case, the defense acknowledged having previously received discovery from the state, and he gave the defense "anything I had in my file." Although the defense alleged in its argument that it had not received the N.C.I.C. record for James Harris, it failed to put on any proof in this regard.

19

Defense counsel did not testify, and well-settled law precludes us from considering arguments of counsel as evidentiary fact. The only evidence of record supports a conclusion that the state provided the defendant with the N.C.I.C. record.

Additionally, as noted by the trial court at the hearing on the motion for new trial, the defendant offered no proof that the witness James Harris and the N.C.I.C.-reported "James Earl Harris" were the same individual. Both have the first and last names James Harris and the same date of birth. Both are black males with brown eyes and black hair. However, there are significant differences. The social security number James Harris gave Detective Pressley and the one reported for James Earl Harris are different. James Earl Harris is heavier than James Harris. James Earl Harris was born in Texas, and James Harris reported his birthplace as South Carolina. We cannot conclude from this record that James Harris and James Earl Harris are the same individual; therefore, it is impossible for us to assess, assuming the state did not turn this information over to the defense, whether it had an obligation to do so. Having failed to carry his burden of proof in this regard, the defendant is not entitled to relief.

*State v. Welcome*, 1998 WL 832433 at *11 (internal citation omitted).

In his habeas corpus petition, Welcome again makes only a conclusory allegation that the prosecution failed to disclose Harris's criminal record. Welcome does not, however, allege additional facts to support this claim and therefore is not entitled to relief on his claim that his rights to due process were violated.

## C. Actual Innocence

Welcome's claim of actual innocence is grounded in his allegation that his brother Steve Welcome confessed to the killing after Welcome's conviction. In an affidavit attached to Welcome's amended post-conviction petition, Steve Welcome testified that he shot

Gregory Pate. [Addendum 10, Technical Record of Post-Conviction Proceedings, pp. 78-79, Affidavit of Steve Welcome].

In addition, Steve Welcome testified at the post-conviction evidentiary hearing that he shot the victim when the victim was scuffling with Paul Welcome. [Addendum 11, Vol. I, Transcript of the Evidence at the Post-Conviction Evidentiary Hearing, p. 52]. Steve Welcome also testified that he told his girlfriend, Angela Johnson, to tell the police that she had seen Paul Welcome with the gun, in order to keep him (Steve) out of jail. [*Id*. at 54-55]. Steve Welcome further testified that he told his attorney that he was the shooter and that she told him not to say that again. [*Id*. at 56].

Steve Welcome testified that he told Paul Welcome's attorney that he was the shooter, but only after his brother had gone to prison. [*Id*. at 59-60]. Steve Welcome acknowledged that he received a plea agreement and pleaded guilty to attempted aggravated robbery in return for a prison sentence of five years; he also acknowledged that he confessed to the shooting only after he had served his time and jeopardy had attached. [*Id*. at 59-61].

Steve Welcome's attorney, Kimberly Ann Parton, testified at the post-conviction hearing and denied that Steve Welcome told her he was the shooter. [*Id*. at 44]. With respect to her client, Ms. Parton testified that she "was hard pressed to believe anything that came out of his mouth." [*Id*.]. She further testified that Steve Welcome had a criminal history and that he "had previously played the [legal] system to his advantage on many occasions." [*Id*. at 47]. Prosecutor Greg Harrison also testified that Steve Welcome "was not credible at all." [*Id*. at 27].

Paul Welcome's attorney testified that Steve Welcome told him, after Paul's conviction and after Steve had served his time, that he Steve was the shooter. [Deposition of William Lee Brown, Addendum 15, Exhibit 4 to the Post-Conviction Evidentiary Hearing, pp. 14-15]. Mr. Brown also recalled that he called to the stand during Welcome's trial a "jail house snitch" who testified that Steve Welcome had admitted to being the shooter." [*Id.* at 25]. A review of the trial transcript reveals that Brian Hicks testified on behalf of the defense and stated that he had been incarcerated with Steve Welcome; Mr. Hicks further testified that during that incarceration, Steve Welcome stated that he (Steve) shot a man who owed his brother some money. [Addendum 4, Transcript of the Evidence, Vol. III, pp. 201-03].

Welcome raised his brother's confession as a ground for relief in a petition for writ of error coram nobis. The trial court and the Tennessee Court of Criminal Appeals considered the issue in conjunction with Welcome's post-conviction petition. The trial court denied the petition and the Tennessee Court of Criminal Appeals affirmed:

> In this appeal, the petitioner asserts that he is entitled to coram nobis relief on the basis of Steve Welcome's confession, which he asserts constitutes newly discovered evidence. A writ of error coram nobis is an extraordinary remedy by which a trial court may provide relief from a judgment under narrow and limited circumstances. The grounds for coram nobis relief are narrow:

>> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

22

The decision to grant or deny the petition lies within the sound discretion of the trial court.

We conclude that Steve Welcome's confession does not constitute newly discovered evidence. The record establishes that Counsel was aware prior to trial that Steve Welcome had confessed to his cell mate, Brian Hicks, and, in fact, offered evidence of Steve Welcome's confession into evidence at trial. Moreover, serious questions exist regarding Steve Welcome's credibility. The timing of the written confession, given after Steve Welcome had served the sentence he received pursuant to a plea bargain for his role in the victim's murder, renders the confession suspect. In addition, Ms. Parton noted Steve Welcome's complete lack of credibility and his history of manipulating the criminal justice system. Under these circumstances, Steve Welcome's confession does not satisfy the requirement of veracity. Finally, as observed by the post-conviction court, the evidence was sufficient to support the petitioner's conviction for first degree murder under a theory of criminal responsibility even if Steve Welcome actually fired the fatal shot. In consequence, the trial court did not abuse its discretion by denying coram nobis relief.

*Welcome v. State*, 2007 WL 4192017 at *6 (quoting Tenn. Code Ann. § 40-26-105(b)) (internal citations omitted).

In his habeas corpus petition, Welcome claims his brother's confession was not available at the time of trial and that the confession would have changed the result of his trial. This Court disagrees. As the witnesses generally agreed, Steve Welcome was not known to be a truthful person. He did not come forward and claim to be the actual shooter until after he had served his sentence, jeopardy had attached, and he could not be tried for the killing. The Court finds Steve Welcome's confession clearly suspect and his after-the-fact confession does not demonstrate Paul Welcome's actual innocence. Accordingly, the determination by the Tennessee Court of Criminal Appeals that Welcome was not entitled to relief as a result of his brother's confession was neither contrary to nor did it involve an unreasonable

23

application of federal law.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

VI.     Conclusion

Respondent's motion to dismiss will be **GRANTED**, the petition for habeas corpus relief will be **DENIED**, and this action will be **DISMISSED**.  Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts.  Welcome having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure.  The Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous.  *See* Rule 24 of the Federal Rules of Appellate Procedure.  The Court will further **DENY** Welcome leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE